UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Latira Ann Burnip, | Case No. 0:18-cv-01839-JRT-KMM |
| Plaintiff, | |
| v. | |
| Credit Acceptance Corporation, and Metro Motor Sales Inc., | REPORT AND RECOMMENDATION |
| Defendants. | |

This matter is before the Court on Defendant Credit Acceptance Corporation's ("CAC") Motion to Compel Arbitration and to Dismiss, or in the Alternative, Stay All Proceedings in this Action.[1] [ECF No. 4.] For the reasons that follow, the Court recommends that CAC's motion to compel arbitration be granted and that this matter be stayed pending resolution of arbitration proceedings.

## I.   Relevant Factual Background

The record relevant to the motion to compel arbitration includes the allegations in Latira Ann Burnip's pleadings and other submissions, the evidentiary materials filed by the Defendants, and the testimony and exhibits from an evidentiary hearing held on December 12, 2018. [Compl., ECF No. 1-1; Am. Compl., ECF No. 13; Pl.'s Consolidated Resp., ECF No. 12; Lewis Aff., ECF No. 6; Retail Installment Contract, ECF No. 6-1; Ex. List, ECF No. 29.]

### A.   Plaintiff's Allegations

Ms. Burnip originally brought this case in Hennepin County District Court. [Compl., ECF No. 1-1.] In her original Complaint, she asserts various claims related to the purchase of a vehicle and the alleged repossession of the vehicle. Specifically, Ms. Burnip seeks to recover and maintain possession of a 2005 Porsche Cayenne she bought from MMS in February 2018. [Compl. at 5 ¶ 1.] She also claims that Defendants are unlawfully refusing to release a lien on

---

[1]   Metro Motor Sales, Inc. ("MMS"), filed a Joinder in CAC's Motion to Compel Arbitration and to Dismiss or in the Alternative Stay All Proceedings in this Action. [ECF No. 19.] That motion should be granted.

1

that vehicle and violated certain private securities laws. [*Id.* at 5 ¶ 1, 7 ¶ b.g.] Ms. Burnip seeks both injunctive relief and "compensatory, punitive, and special Damages against the Defendant(s) for the sum certain amount of $17,500.00." [*Id.* at 10, Prayer for Relief ¶¶ A–E.] CAC removed the case to federal court on July 2, 2018. [Notice of Removal, ECF No. 1.]

Ms. Burnip later filed an Amended Complaint, which is similar in many respects to the original and asserts claims arising out of the same transaction to purchase the 2005 Porsche. She again includes allegations regarding the Defendants' efforts at repossession, her desire to have a lien on the vehicle released, and violations of private securities laws. [*Id.* ¶¶ 1, 3; *id.* at 4, ¶ b.g.] She also alleges that CAC and MMS have made reports to consumer credit reporting entities that have harmed her creditworthiness and cause her other damages. [*Id.* at 4, ¶ f.7.] Ms. Burnip continues to seek injunctive relief and damages [*Id.* at 7–8, Prayer for Relief].

In Exhibit B to Ms. Burnip's Amended Complaint, she asserts that she owes nothing on the vehicle despite the Defendants' assertion that she defaulted on a loan. [Am. Compl., Ex. B.] Ms. Burnip also states that she "contacted a specialist ... and SEC investigators" who indicated that "the contract – if any existed – had been securitized possibly for CUSIP and STRIPS registrations." [*Id.*] She claims that securitization required Defendants to file SEC registration documentation, which in turn would mean that all parties' obligations had been satisfied on any contract. Thus, she believes any allegation of default by the Defendants is improper. [*See id.*] Finally, she asserts that "[a]ny signatures exhibited are not mine and any forgeries are not consensual...." [*Id.* at 3.]

### B. The Contract and Arbitration Agreement

On July 9, 2018, CAC moved to compel arbitration, a motion later joined by MMS. [ECF Nos. 4, 19.] In support of its motion, CAC presented evidence showing that Ms. Burnip entered a contract containing an arbitration clause. Specifically, CAC's evidence shows that on February 9, 2018, Ms. Burnip entered a Retail Installment Contract with MMS for the purchase of a 2005 Porsche Cayenne. [ECF No. 6-1.] In exchange for credit Ms. Burnip received to purchase the vehicle, the contract provided that Ms. Burnip would make 45 monthly payments beginning on March 9, 2018. [*Id.* at 1.] Ms. Burnip and a representative of MMS electronically signed the agreement. [*Id.* at 2.] MMS assigned all of its rights under the contract to CAC, giving CAC "full power ... to take all actions which [MMS] could have taken under" the contract. [*Id.* at 4.]

The contract's arbitration clause specified that Ms. Burnip and MMS agreed to resolve any dispute relating to their agreement by arbitration instead of court action. [ECF No. 6-1 at 1,

5.] Ms. Burnip acknowledged that she read, understood, and agreed to the terms and conditions of the arbitration clause. [*Id.* at 1.] The arbitration clause states that either party to the contract "may require any Dispute to be arbitrated and may do so before or after a lawsuit has been started over the Dispute...." [*Id.* at 5.] A "Dispute" is defined in the contract as:

> any controversy or claim between You and Us arising out of or in any way related to this Contract, including, but not limited to, any default under this Contract, the collection of amounts due under this Contract, the purchase, sale, delivery, set-up, quality of the Vehicle, advertising for the Vehicle or its financing, or any product or service included in this Contract.

[*Id.* at 5.] The contract defines the terms "we" and "us" as including MMS and, "without limitation, Credit Acceptance Corporation...." [*Id.* at 5.]

The arbitration clause also includes a right-to-reject clause. [ECF No. 6-1 at 5.] Under that clause, Ms. Burnip had 30 days after the date the contract was executed to inform MMS that she was rejecting the arbitration clause. [*Id.* at 5.] The clause also provides that if Ms. Burnip does not reject the arbitration clause, it will be effective as of the date of the contract. [*Id.*] CAC has not received any notification that Ms. Burnip rejected the arbitration agreement. [Lewis Aff. ¶ 5, ECF No. 6.]

### C. Plaintiff's Consolidated Response

Ms. Burnip filed a "Consolidated Response" to the motion in which she clarified that she seeks to enjoin any sale of the vehicle forced by the Defnedants, to obtain a release of any liens and encumbrances on title, to be declared the owner of the vehicle, and for damages. [Consolidated Resp. at 2, ECF No. 12.] Ms. Burnip reiterated her claim that documents relating to the purchase of the vehicle that have been provided by the Defendants are "clever forgeries," and complained that the Defendants cannot produce an original contract. [*Id.* at 3; *see also id.* at 10 (alleging that the attorneys representing the Defendants do not have and have not produced original contracts).

Ms. Burnip also asks the Court to remand this case back to Hennepin County, where she filed her original Complaint. [Consolidated Resp. at 2.] She contends that the Defendants' removal of the case on grounds of diversity was improper because the lawyers representing the Defendants "are implied Defendants in the suit." [*Id.* at 5.] Because the Defendants' lawyers are in Minnesota, she asserts that the case should not have been removed to federal court due to the forum-defendant rule. [*Id.* at 7–8.]

3

### D.     Evidentiary Hearing

On November 19, 2018, after reviewing the parties' submissions, the Court issued an Order scheduling an evidentiary hearing to resolve the factual dispute concerning the validity of the contract. [ECF No. 25.] The Court explained:

> Specifically, CAC has alleged that Ms. Burnip signed a Retail Installment Contract that contains an arbitration agreement. [*See* Aff. of Sharron Lewis ¶ 4, Ex. A (Retail Installment Contract), ECF No. 6-1.] In several filings, Ms. Burnip has asserted that any signatures provided by the Defendants are not hers or are forgeries. [*See* Compl. at 11 ¶ 5 ("Any signatures exhibited are not mine...."), ECF No. 1-1; Am. Compl. at 14 ¶ 5 (same), ECF No. 13; *see also* Consolidated Resp. at 3 (referring to "clever forgeries" held by the Defendants).]

[ECF No. 25 at 1–2.] The Court ordered the parties to appear for the evidentiary hearing "to resolve the limited factual dispute concerning whether Ms. Burnip signed the Retail Installment Contract at issue." [*Id.* at 2 (citing *Nebraska Machinery Co. v. Cargotec Solutions, LLC*, 762 F.3d 737, 743–44 (8th Cir. 2014).][2]

The hearing in this matter was held on December 12, 2018. MMS presented the testimony of Alicia Blanchard, an owner-operator of the business. MMS also offered eleven exhibits, which were admitted into evidence over Ms. Burnip's objections. Ms. Blanchard testified that she specifically recalled the transaction with Ms. Burnip for the 2005 Porsche. Ms. Blanchard explained that on February 9, 2018, an individual named James Campbell[3] came in to test drive the Porsche. While Mr. Campbell was driving the vehicle, Ms. Blanchard received a credit application to purchase the Porsche from Ms. Burnip through MMS's online application tool. Ms. Blanchard called Ms. Burnip to verify the information in the credit application, including the sources of income she listed on her application.

MMS and CAC have a business arrangement whereby CAC provides financing directly to customers who are interested in purchasing MMS's vehicles. When Ms. Burnip completed the credit application online, the information she provided was loaded automatically into CAC's

---

[2]     Ms. Burnip declined the Court's invitation to have volunteer counsel enter a limited notice of appearance to represent her for the sole purpose of conducting the evidentiary hearing. [ECF Nos. 26 & 27.]

[3]     Mr. Campbell appeared with Ms. Burnip at the evidentiary hearing. The Court allowed Mr. Campbell to sit with Ms. Burnip at counsel table for support. However, because he is not an attorney licensed to practice law, the Court explained that Mr. Campbell would not be permitted to make objections on her behalf or otherwise participate in the proceedings.

system, which is linked to MMS's inventory. Ms. Blanchard explained that when a customer buys a vehicle from MMS using CAC credit, a purchase agreement and financing paperwork are electronically signed using CAC's system and loan documents and paystubs are uploaded to that system so that any loan can be underwritten. Ms. Blanchard testified that when she spoke to Ms. Burnip, she informed Ms. Burnip that her credit application had been approved. Ms. Burnip indicated that she would come into the MMS office to continue the transaction. When Mr. Campbell returned to the dealership from his test drive, he explained that he and Ms. Burnip were connected and that Ms. Burnip would be coming in to complete the financing paperwork for the vehicle.

When Ms. Burnip came into the dealership later that day she provided Ms. Blanchard her driver's license and paystubs verifying her employment. [Hr'g Exs. 4 & 5.] Ms. Blanchard and Ms. Burnip then completed a "Bill of Sale" for the Porsche. On the Bill of Sale, Ms. Blanchard indicated in her own handwriting the cash down payment that Ms. Burnip provided for the vehicle. [Hr'g Ex. 6.] Both Ms. Burnip and Ms. Blanchard signed the Bill of Sale. [*Id.*]

The relevant paperwork also included the Retail Installment Contract that Ms. Burnip andMs. Blanchard executed electronically on Ms. Blanchard's computer. While seated at her desk in her office, Ms. Blanchard pointed her computer screen toward Ms. Burnip and gave Ms. Burnip control of the computer and her mouse.[4] To navigate through the document, Ms. Burnip was required to click the cursor in several boxes on the screen that were highlighted yellow, indicating her assent to the terms of the agreement. [Hr'g Ex. 7 at 1–5 ("Buyer's Initials" fields with "LAB").] Ms. Blanchard watched Ms. Burnip go through the Retail Installment Contract and click on the highlighted boxes. Ms. Burnip's initials appear in a box on the first page of the contract acknowledging the arbitration agreement and again on the fifth page of the contract setting forth the full terms of that arbitration clause. [Hr'g Ex. 7 at 1, 5.]

The record also contains a paper original "Declaration Acknowledging Electronic Signature Process," signed in ink by Ms. Burnip and Ms. Blanchard. [Hr'g Ex. 8.] This Declaration indicates that Ms. Burnip "consented to use electronic signatures to sign all documents necessary to process a retail installment transaction" with MMS for the Porsche. In it,

---

[4] Ms. Blanchard controlled the mouse at certain times to click on boxes where she was required to enter her own electronic signature. [Hr'g Ex. 7 at 2, 4.] Ms. Blanchard explained that her name appears as Alicia Siedow in these fields because she married after the transaction at issue in this case and changed her name.

5

Ms. Burnip acknowledged that she was given the opportunity to review a paper version of the Retail Installment Contract, that she was in physical control of the mouse to click the highlighted boxes to apply her electronic signature to the documents, that by doing so she intended to sign the documents as if she provided her handwritten signature, and that she received a fully executed copy of the agreement. [*Id.*] Ms. Blanchard signed the declaration on behalf of MMS, and acknowledged that she watched Ms. Burnip use the mouse to click the initial boxes and assent to the terms of the Retail Installment Contract. [*Id.*]

At the evidentiary hearing, Ms. Burnip declined to cross-examine Ms. Blanchard, did not testify, and did not call any witnesses or seek to introduce any documentary evidence of her own in support of her position.

### III. Discussion

Based on the arbitration clause in the Retail Installment Contract, CAC argues that Ms. Burnip should be required to arbitrate her claims rather than litigate them in a court proceeding. CAC asserts that the type of claims in Ms. Burnip's pleadings fall within the arbitration clause. As explained below, the Court recommends that the motion to compel arbitration be granted.

#### A. Legal Standards

Section 2 of the Federal Arbitration Act ("FAA") provides that a written arbitration agreement in "a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable...." 9 U.S.C. § 2. The FAA thus establishes a federal policy favoring arbitration of disputes. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Lyster v. Ryan's Family Steak Houses, Inc.*, 239 F.3d 943, 945 (8th Cir. 2001). In determining if it is appropriate to compel arbitration consistent with that policy, courts ask: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute falls within the scope of the arbitration agreement at issue. *Newspaper Guild of St. Louis, Local 36-47 v. St. Louis Dispatch, LLC*, 641 F.3d 263, 266 (8th Cir. 2011).

The appropriate procedural mechanisms for compelling arbitration are either a motion to dismiss under Rule 12(b)(6), or a motion for summary judgment pursuant to Rule 56. *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018). "Whether or not parties entered into an arbitration agreement falls to judicial determination," and "courts have analyzed the issue using a summary judgment standard—viewing the evidence in the light most favorable to the non-moving party."

6

*Schwalm v. TCF National Bank*, 226 F. Supp. 3d 937, 940 (D.S.D. 2016) (citing *Neb. Mach. Co. v. Cargotec Solutions, LLC*, 762 F.3d 737, 741–42 (8th Cir. 2014)). However, if a material fact dispute is raised that concerns the "'making of the arbitration agreement ... the court shall proceed summarily to trial thereof,'" and the court resolves the fact issue when no jury trial is requested. *Nebraska Machinery Co.*, 762 F.3d at 743 (quoting 9 U.S.C. § 4).

    **B.**    **Analysis**

The Court concludes that there is a valid agreement to arbitrate between the parties and the claims alleged in Ms. Burnip's pleadings fall within the scope of that agreement. Accordingly, an arbitrator should determine the merits of Ms. Burnip's claims concerning the Defendants' assertion of default, failure to remove a lien on and attempts to repossess the vehicle, and other actions.

    ***There is a Valid Agreement to Arbitrate***

Through her written submissions, Ms. Burnip clearly challenged the validity of the contract containing the arbitration agreement. Ms. Burnip argued that she should not be compelled to arbitrate because the electronic signatures on the copy of the Retail Installment Contract containing the arbitration clause were legally insufficient. As explained in the Court's November 19, 2018 Order, Ms. Burnip raised a genuine fact dispute concerning the validity of the contract and the authenticity of her signatures.[5] Therefore, the Court is charged with determining the issue of the validity of Ms. Burnip's signatures on the contract containing the arbitration agreement.

The evidence before the Court conclusively establishes that a valid agreement to arbitrate was entered between the parties. Ms. Blanchard's highly credible and uncontroverted testimony demonstrates that Ms. Burnip personally executed several documents at MMS on February 9,

---

[5] Although some of Ms. Burnip's filings referred to the signature as a "forgery," the Court does not construe her argument to be that someone falsified the signature, impersonated her, or otherwise engaged in some fraud. Instead, the Court construes Ms. Burnip's use of the term "forgery" in the context of her repeated objections to the introduction of documentary evidence at the hearing on the basis of the "best evidence rule," and her assertions elsewhere in the record that any purported contracts are legally insufficient because they do not contain "wet ink" signatures. [*See, e.g.,* ECF No. 27 at 1 ("Plaintiff requests that this court protect all of her private rights in this matter and do not accept as a valid contract 'any' document/contract signature thereon to be real except the 'original' with a wet ink signature, and or lawfully notarized signature authenticated.").]

2018 so that she could purchase the Porsche and obtain financing from CAC. Ms. Burnip completed an online credit application to buy the vehicle, she provided MMS with documentation necessary to complete the financing, she physically signed a Bill of Sale, she used Ms. Blanchard's computer and its mouse to indicate her assent to the terms of the Retail Installment Contract, and she physically signed a Declaration Acknowledging Electronic Signature Process, assenting to the use of electronic signatures. On the Retail Installment Contract itself, Ms. Burnip specifically used the mouse to click a highlighted box acknowledging that the agreement contained an arbitration clause and she clicked a box initialing the final page of the agreement that contains the arbitration clause itself.

The Court makes two additional findings concerning the enforceability of the arbitration clause. First, although the Retail Installment Agreement is entered into between Ms. Burnip and MMS, the contract contains a clear assignment clause giving CAC all of the powers that MMS possessed to enforce the terms of the agreement and the arbitration clause itself specifically includes CAC as a party with the power to demand arbitration over any arbitrable dispute. Second, there is no evidence that Ms. Burnip ever indicated she did not want to bound by the arbitration clause pursuant to the "Right to Reject" provision, which gave her thirty days from February 9, 2018 to send written notice of the rejection. Because she did not do so, the arbitration clause became "effective as of the date of th[e] Contract." [Hr'g Ex. 7 at 5.]

### *The Best Evidence Rule and Electronic Documents*

Both before and at the evidentiary hearing, Ms. Burnip objected based on the best-evidence rule, arguing that the Retail Installment Contract offered by the Defendants was insufficient to show an agreement to arbitrate was made because no original contract had been presented bearing a "wet ink" signature. Ms. Burnip's reliance on the best-evidence rule and the absence of a "wet ink" signature are both misplaced.

First, the best-evidence rule does not support Ms. Burnip's position. Federal Rule of Evidence 1002 is also "known as the 'best evidence rule.'" *See United States v. Buchanan*, 604 F.3d 517, 522 (8th Cir. 2010). It provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." Fed. R. Evid. 1002. "An 'original' of a writing ... means the writing ... itself." Fed. R. Evid. 1001(d). However, "[f]or electronically stored information, 'original' means any printout—or other output readable by sight—if it accurately reflects the information." Fed. R. Evid. 1001(d). The Retail Installment Contract, which was executed electronically on

8

Ms. Blanchard's computer, is electronically stored information within the meaning of Rule 1001(d). As such, the printout provided as an exhibit at the evidentiary hearing and the readable output of the Retail Installment Contract electronically filed in this case both qualify as originals sufficient to satisfy the best-evidence rule. The Court can properly rely on the printout and the electronically filed PDF for proof of the Retail Installment Contract's contents. Accordingly, the Court rejects Ms. Burnip's argument that she cannot be compelled to arbitrate because no original contract containing an arbitration clause was provided.

Second, the Court rejects Ms. Burnip's argument that the Defendants have failed to prove that an agreement to arbitrate exists because they have not produced a document containing a "wet ink" signature.[6] Minnesota law[7] governs whether a valid arbitration agreement exists between Ms. Burnip and the Defendants. *Wold v. Dell Fin. Servs., L.P.*, 598 F. Supp. 2d 984, 986–87 (D. Minn. 2009) ("In order to establish whether a valid arbitration agreement exists, courts apply ordinary state law principles governing the formation of contracts.") (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). In Minnesota, "'[e]lectronic signature' means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Minn. Stat. § 325L.02(h). In addition, "[a]n ... electronic signature is attributable to a person if it was the act of the person." Minn. Stat. § 325L.09(a). "A record or signature may not be denied legal effect or enforceability solely because it is in electronic form," and "[a] contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation." Minn. Stat. § 325L.07(a) & (b).

Pursuant to these statutory provisions, the Retail Installment Contract containing the arbitration clause bears a legally recognized electronic signature and is a valid and enforceable agreement despite the absence of a "wet ink" signature on the document. The undisputed evidence demonstrates that the initials "LAB" and the italicized "Latira A Burnip" notations found throughout the Retail Installment Contract are electronic signatures within the meaning of

---

[6] The Court notes that the record indeed contains several examples of original documents reflecting Ms. Burnip's "wet ink" signature, including the Bill of Sale for the Porsche she executed with MMS and the Declaration Acknowledging Electronic Signature Process. [Hr'g Exs. 6, 8.]

[7] The Retail Installment Contract provides that its "terms ... are governed by the law of the state of the Seller's address shown on page 1 of this Contract," which is Minnesota. [Hr'g Ex. 7 at 4.] Neither party has suggested that any other state's law applies.

9

Minn. Stat. § 325L.02(h). The evidence also establishes that Ms. Burnip intended her use of the mouse to click on the highlighted yellow boxes shown on Ms. Blanchard's computer to have the same effect as a physical signature. *Id.* (noting that an electronic signature requires that the individual intended to sign the record through the process attaching a symbol to an electronic record). Ms. Burnip's Declaration Acknowledging Electronic Signature Process and Ms. Blanchard's testimony at the hearing also establish that the electronic signatures on the Retail Installment contract are attributable to Ms. Burnip pursuant to Minn. Stat. § 325L.09(a). *See also* Minn. Stat. § 325L.09(b) ("The effect of an electronic record or electronic signature attributed to a person under paragraph (a) is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption...."). As such, Ms. Burnip's electronic signatures and the contract may not be denied legal effect under Minnesota law solely because they were accomplished by electronic means. Minn. Stat. § 325L.07(a) & (b).

Ms. Burnip raises no other challenge to the validity of the contract containing the agreement to arbitrate or the arbitration clause itself. On January 2, 2019, Ms. Burnip filed an "Affidavit of Revocation of Signature" in which she purports to "rescind, revoke, and/or cancel all signature attached to [the Retail Installment Contract] and/or PERSON with the name LATIRA ANN BURNIP, a social security number, and/or a *alleged* date of birth on it for anyone who construes that to be a contract." [ECF No. 31 at 1 (italics in original).] Ms. Burnip appears to believe that this revocation somehow effectively nullifies the conclusive evidence in the record that she entered into a valid and enforceable Retail Installment Contract with MMS that contains an arbitration clause. The Court is aware of no basis in the law to find that Ms. Burnip's purported post hoc revocation of her signature has any effect on the validity of the contract.

For all the foregoing reasons, the Court finds that there is a valid and enforceable arbitration agreement between Ms. Burnip and CAC, and Ms. Burnip's arguments to the contrary do not carry the day.

### *This Dispute Falls Within The Arbitration Agreement*

When deciding whether a dispute falls within an arbitration agreement, courts must give them a "liberal reading." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, n.27 (1983); *Esanbock v. Weyerhaeuser Co.*, No. 17-cv-3702 (SRN/DTS), 2019 WL 77308, at *4 (D. Minn. Jan. 2, 2019) (quoting *Moses H. Cone*). "[A]ny doubts as to arbitrability are resolved in favor of arbitration." *Esanbock*, 2019 WL 77308, at *4 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Against this backdrop, the Court must conclude that the dispute raised by Ms. Burnip's pleadings falls within the arbitration agreement. The arbitration clause in this case is broad. It applies to any claim between Ms. Burnip and CAC or MMS that arises out of or *in any way* relates to the Retail Installment Contract. This specifically includes any disagreement as to whether Ms. Burnip defaulted on the loan payments she was required to make under the Retail Installment Contract. Ms. Burnip's original Complaint and her Amended Complaint plainly raise a dispute that relates to the Retail Installment Contract. In her pleadings, she claims that: she is not in default; Defendants improperly retain a lien on the vehicle; she owes nothing on the vehicle and should be declared its owner; and the Defendants violated private securities laws by securitizing the auto loan and failing to file certain unidentified documentation. All of these claims arise out of or relate to the Retail Installment Contract.

Ms. Burnip also seeks compensatory and punitive damages in her lawsuit, which forecloses any argument that her claims fall within an arbitration clause for individual actions commenced by the buyer to prevent repossession. The arbitration clause provides that the disputes required to be arbitrated do not include any actions initiated by Ms. Burnip to prevent the Defendants from repossessing the vehicle, "so long as such individual action does not involve a request for monetary relief of any kind." [Hr'g Ex. 7 at 5.] Though Ms. Burnip initiated this lawsuit, in part, to prevent repossession of the vehicle by the Defendants, she explicitly requests monetary relief in her pleadings, thereby removing this case from the arbitration clause's exception to the broad definition of dispute.

It is noteworthy that Ms. Burnip has not argued that the dispute here falls outside of the arbitration agreement, instead focusing her opposition on the flawed best-evidence and "wet ink" signature arguments discussed above. Because her dispute with MMS and CAC plainly falls within the broad arbitration clause, the Defendants were entitled to demand arbitration. Accordingly, the motion to compel arbitration should be granted and this case should be stayed pending its resolution. 9 U.S.C. § 3 (providing that cases involving issues falling within the parties' arbitration agreement be stayed until the arbitration has been conducted pursuant to the terms of the agreement).

### III.     Plaintiff's Request for Remand

In Ms. Burnip's "Consolidated Response," she requests that this matter be remanded to Hennepin County District Court because the Defendants improperly removed it. She argues that the case should bot have been removed because there is no diversity of citizenship. She also

11

asserts that removal was improper under the forum-defendant rule because the attorneys representing the Defendants are implied parties, who are in Minnesota. Neither argument is persuasive.

Removal of actions over which the federal court could exercise diversity jurisdiction is proper, but it is not the only way a case can be removed. Pursuant to the federal removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants...." 28 U.S.C. § 1441(a). Cases over which the Court has "original jurisdiction" includes not only diversity cases under 28 U.S.C. § 1332, but also federal-question cases under § 1331. The basis for CAC's removal of this case was not diversity of citizenship. Instead, it was based on the fact that Ms. Burnip alleged violations of federal securities laws. [Notice of Removal ¶ 7.] Ms. Burnip has not disputed that removal was proper on grounds of federal-question jurisdiction. Because the Court has original jurisdiction over a dispute concerning federal securities laws, it makes no difference whether there is complete diversity of the parties.

This same reasoning makes the so-called "forum defendant rule" in 28 U.S.C. § 1441(b) inapplicable to this case. The form-defendant rule prevents a Minnesota defendant from removing a case to federal court in the District of Minnesota where the federal court's jurisdiction is based "solely" on diversity of citizenship under § 1332(a). But because this case was not removed on the basis of diversity jurisdiction at all, the Court has original jurisdiction over the federal question presented by Ms. Burnip's claims that the Defendants violated federal securities laws.

The Court concludes that Ms. Burnip's request that this action be remanded to Hennepin County District Court be denied because there is no indication that removal was improper.

## IV. Recommendation

For the reasons outlined above, the Court makes the following recommendations:

1. Credit Acceptance Corporation's Motion to Compel Arbitration **(ECF No. 4)** should be **GRANTED** to the extent it requests an Order compelling arbitration and a stay of these proceedings pending the arbitration's outcome.

2. Metro Motor Sales, Inc.'s Motion for Joinder **(ECF No. 19)** should be **GRANTED**.

3. Plaintiff's request that this case be remanded to Hennepin County District Court (**ECF No. 12**) should be **DENIED**.

4. The parties should be Ordered to arbitrate the issues raised in this action and this matter should be **STAYED** pending the outcome of arbitration between the parties.

Date: January 15, 2019              *s/Katherine Menendez*
                                     Katherine Menendez
                                     United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.